May it please the Court, Brian Brown appearing on behalf of Appellants Julie Brandt and Dina Negron. This case at its threshold issue presents an issue of jurisdiction of this court to hear this appeal as well as the appeal itself of a denial of a qualified immunity during the summary judgment phase of the case in the court below. Is the appellants position that this court has jurisdiction over this appeal and is also the position of the appellants that the district court erred in its application of the qualified immunity defense. Specifically it is the appellants position that the court erred by considering facts outside of the knowledge of the individuals asserting qualified immunity when it determined that there was an issue of fact that precluded the entry of summary judgment. Specifically this matter finds its origin on May 15th 2009 actually in the very early morning the late evening of the 14th of 2009 to May 15th of 2009 in which Washoe County Social Services eventually received a telephone call to their on-call worker Julie Brandt. Would you repeat that date again? May 15th the call may have started your honor on the 14th of May but it was 1130 1145 and so either the facts of the 14th or 15th of May 2009. Miss Brandt received a call and she was informed that there was a young person that had been taken to Pyramid Lake at the age of two years old by her biological mother Miss LaPrairie. It was alleged that there was a welfare check called into the Washoe County dispatch to the sheriff's office by her mother to do a welfare check because she was concerned for the grandchild's safety. I want to be real real precise about what Miss Brandt knew and sort of when she knew it. It's the Watergate question. How many phone calls did Miss Brandt receive that night? Receive or make? I believe she would have made three I believe total your honor. Three calls total? I believe she received a call from Washoe County dispatch. I am unclear when she eventually was talking to them. She contacted her supervisor the other appellant Miss Dina Negron. I am unclear if she... In between that didn't she have a conversation with one of the officers? She had a conversation with the dispatch person. I thought you said there were three calls. I'm not I'm unclear of whether when she was contact Miss Negron or she then kept them on hold while she used another phone to contact Miss Negron. I thought she actually spoke with one of the officers maybe not necessarily officer Brannon but I thought she I thought she spoke to somebody. There was a there was a search-and-rescue how this works a Pyramid Lake is on a Paiute Indian tribe reservation in a very remote area of Washoe County and when the call went in from the maternal grandmother to dispatch there was a jurisdictional issue because the Paiute Indian police would initially respond on reservation property. They were unable to locate the family that was camping and contacted and utilized Washoe County search-and- rescue an attempt to locate the campsite of these particular individuals. Who is Officer DiPaoli? Officer DiPaoli is a officer with the Washoe County search- and-rescue. Okay and she spoke with him? I believe she may have. She said she said she remembered speaking to somebody to an officer. Now at what point would she have spoken to him before or after she spoke to dispatch? I believe it would have been the same time I don't know of any other way that he would have been able to contact her except through the dispatch. Once she spoke with her with her supervisor did she talk with anybody else over at the any of anybody else besides Mr. Goen? Who else was who did she have to call next in order to? My understanding is she either returned to the same phone call or contacted the dispatch person back and advised the dispatch that they would be willing to accept placement of the minor child into their custody. Okay now she says I'm looking at 243 on the excerpts of record. It's page 28 of her deposition. Question do you recall speaking to an officer? Now is that the officer at the time that she that that they that they meet to transfer the child? With the page number again your honor. That's 243. Thank you. So is that a face-to-face conversation when she picks up the child? Yes that is the officer that she had been using to pick up the child. Okay and so she she only spoke with dispatch but she may have spoken to dispatch twice? That's I'm unclear about your honor. I'm talking to dispatch if she terminated that call. Or whether she just put them on hold. Put them on hold. So it was an interrupted conversation in any event. That's correct. What Miss Brant and I think your honor went wanted to go right to the factual issues. What Miss Brant was told directly and she has testified to do to is that the police were responding to a child welfare request from the minor child's grandmother. That the dispatch had told her that the grandmother had informed them that the mother had a history of drug abuse, past suicidal ideations, was potentially suicidal. So here's all of this from dispatch? That's my that's what she received from dispatch. That's correct. This is what she testified that she received from dispatch although there were no notes. But we have a testimony from officer Brennan that he spoke to dispatch and he has a report that said he that the they had been found sleeping and that the the mother seemed okay. Isn't that correct? Yes that is correct your honor that and that is the issue. The issue that the court must decide is there is testimony from contact at the scene and it's our position. Well let me ask you this why can't a jury look at here the testimony of what Miss Brant said she heard from dispatch and then hear the testimony of what the officer said he said to dispatch and straighten out in their own minds who said what to whom? Why do they have to disregard what the officer said he said to dispatch? Well I think at the time that this matter was before the court it was on summary judgment stage and discovery had been completed. It's our position that there is no evidence in the record on when the court is analyzing the qualified immunity defense which is whether the law was clearly established and given the facts and the individual social worker known to them at the time. But I'm saying isn't there a dispute about what was known to her? It seems to me you're saying that officer Brannon's statements cannot be considered because we don't have direct evidence of what was said from the dispatch to Miss Brant other than her statement and that we that the information that she testified to Officer Brannon has to be disregarded. Is that your argument? It can't be considered? At this stage absolutely. I believe that there's no issue of fact. There is nothing in the record that was ever communicated directly to Miss Brant other than the information that she testified to. And I think this is an important point to note the court would go down that type of reasoning that there was an issue of fact with regard to that which we don't believe there is. There is clearly no issue of fact with the supervisor Miss Negron because it is there is no evidence in the record anywhere that Miss Negron talked to anybody but Miss Brant. But couldn't Miss Brant have told her what the police might have told Miss Brant? At this point if you engage in that supposition, the other supposition can be engaged in. And that's why I would prefer that the court not engage in supposition. This was a time of summary judgment where the facts would be decided. And what you're being asked to do is to not actually look at and find admissible evidence. You're looking to speculate as to what may or may not have occurred. Isn't there a presumption that official duty is duly executed? Therefore that what the dispatch person heard from the police officer Brant was accurately relayed to social worker Brant? I'm not aware of any precedent that would analyze qualified immunity by binding the officer that they have total knowledge of everybody involved in the investigation. On a question of fact, on a summary judgment, isn't it more likely than not that what the deputy told dispatch, dispatch told Brant? There's no evidence that that occurred in this case. There's evidence that Brant talked to dispatch. Absolutely. And there's evidence that dispatch talked to Brant. Absolutely. Can't we indulge in a presumption that more likely than not that what dispatch told Brant was what dispatch heard from Brant? I would think at that point, your honor, you're really speculating as to what occurred. And the analysis really requires what the evidence shows. There was no further discovery had by the plaintiffs in this case that have the burden of proof to see if in fact it was told. The dispatch officer got information from the grandmother that called from search and rescue that called. And perhaps she didn't get the information. Perhaps she didn't relay it. All that we have are we have two people that were making a decision on the ground. And this is the information that they identify that they were told. One other question. The drug test that had been run on Missoula Prairie was, I believe, returned to social services on May 13th, 2009. I believe that. Two days before this incident. That is correct. What does the record show as to whether the results of that drug test showed not only that Missoula Prairie was ingesting marijuana, but also methamphetamines and amphetamines? Was that known to A, Brant, B, Negron, C, dispatch? I believe that the information was known. It possibly may have been known to dispatch. What dispatch knew from the maternal grandmother is that her daughter had an appointment with social services the following day. And she felt at that time that social services was going to remove her child. I am unclear whether she told her it was because of a positive drug test. So with that regard, whether dispatch knew that or not, I don't know the answer to that. I do know that Miss Negron, or excuse me, Miss Brant accessed the online database and was able to determine that information. I tried to find. I'm sorry. I just tried to find. You go ahead, Judge Beyer. I'm going to wait now. I just wanted to get a record citation to Brant having knowledge of the May 13 drug test results. Your Honor, at this point, I may need to supplement the record for you to tell you where it's at. It possibly may be at 244 to 245. All right. You have very little time. Do you want to save some time for rebuttal? I think Judge Rustoni had a question. I'm sorry. I was a little lagged there. You said she accessed the computer records. I could not find evidence or copy of what was in those computer records. Do we know exactly what was in the computer records that she said she accessed? Your Honor, I believe those records were part of the discovery process in the matter below, but I don't think that they were ever formally made part of the summary judgment record. I have one more question. If the facts were known to Brant, were those that Officer Brennan put in his report, do you still contend that there was a constitutional violation? I don't contend there was any constitutional violation. I'm sorry, that there was no constitutional violation. I left out the no. No wonder you were confused. Okay. I just wanted to make sure I was answering the right question, Your Honor. Right. If the information was known from Officer Brennan to Ms. Brant, would there have been a constitutional violation? Correct. If the same decision was made? I think it's hard for me to speculate. Yes, but if they took the child without a warrant, but they knew all those things that Officer Brennan put in his report, would there have been a constitutional violation? With regard to the child being well cared for, with the child being safe, is what I believe he said. Yes, but the officer concluded the child was safe. I would not want to go back into the social worker's mind because you have other things to look at in this case. You have an individual that has, at least to her grandmother, expressed potential suicidal ideations. Officer Brennan has one piece of the information, possible suicidal ideations in the past and potentially in the future. She is also in an extremely remote area of the community with a two-year-old child, while her blood alcohol level is a .14, nearly double the legal limit to drive or safely drive an automobile. According to Ms. Brant's testimony… Well, I was misinterpreting your question. If you want me to analyze what I think the court would say if they took all of those things into consideration, I think that would be a hard-pressed situation for them to advocate for the removal of a child without a warrant. Okay. If that's the question you're asking me. I have a different question. There's still a lot of other factors to consider. And for someone on the ground that has… I mean, her testimony was that you had an intoxicated, belligerent person that also had suicidal ideations and was afraid her kid was going to be taken away. She's less than a half a block in distance away from open water while that intoxicated with a two-year-old child. Another half a mile from a highway and between there is complete remote desert. So there are a lot of factors to consider. Given the officer's assessment that he assessed her to be safe and was actually present, it's very well likely that a different decision would have been made and it perhaps would have caused a warrant to be required before the exigent. It certainly would have been less than what we have here. Okay. Thank you. Okay. I will allow you a minute for rebuttal. May it please the Court. Good afternoon. I'm Jeffrey Friedman from Reno, Nevada, representing here at the Lee in association with David Bouvet from Oakland, who's not here, and William R. Kendall from Reno, who's not here. I'm here to appeal the article that the district court's analysis was in accordance with existing law. This is a wrongful appeal of a denial of a summary judgment motion where the facts were in dispute. That's what the judge found. The district court's analysis was in accordance with existing law. What facts were in dispute, sir? The facts as to what the social worker knew. What the social worker gleaned from the conversation with the dispatcher. Yes, sir. Now, we have the social worker telling us what she heard the dispatcher say, and we have Deputy Brennan saying what he told the dispatcher. Yes. So you have two of three players in a telephone game, but not all three. Well, there are no records from dispatch. Well, whose fault is that? Dispatch, I guess. No, the plaintiff for not taking dispatch's depositions. The plaintiff subpoenaed the records from dispatch, and there were no records. So you have A telling dispatch a story and dispatch telling C a story. But dispatch being B, we don't know what dispatch told C nor what dispatch heard from A. And we never will. There are no records. Do you think it's reasonable to conclude that what Officer Brennan told dispatch was passed on to the social worker? Yes, particularly in light of her notes. In light of whose notes? She has notes. She had a note that said three things on it, Your Honor. I have that right here. What are we talking about? Are we talking about Brennan, dispatch, or Brant? Brant. Brant's notes. In Brant's notes, she said they're camping at Pyramid Lake. I'm sorry. Are her notes in the record? Yes. They were on her deposition. Although I have testimony about her deposition. Are these handwritten notes? Yes. Okay. Where are they in the record? I thought they were an exhibit to her deposition. You don't have a page for us in the record? Yes, I do. I have the ERs. Did you file a supplemental exit for the record? No.  Okay. Well, I'd like to see it. I have it here in my ‑‑ it's in our motion for summary opposition, the motion for summary judgment. Can you give me the page then? I mean, the site is there. The site to what? You mean to her handwritten notes? Yes. Well, I don't have the handwritten notes. How can it be in the record if you've told me it's someplace else but in the record I don't have access to? Well, you have the opposition motion for summary judgment as part of the record. Okay. Is it in there? I'm looking ‑‑ I want to see what you're reading from when you tell me what's in her handwritten notes. Well, I'll have to supplement the record. I just went over it today, Your Honor. I saw it today. Okay. And could I tell you what's in there and supplement the record? Okay. It doesn't look to me like it's in there. So what I really have is ‑‑ all I really have is in Volume 1 I just have the exchanges of lawyers' papers. In Volume 2 I have three depositions. Okay. And it's not attached to any of the depositions that I saw. Well, it's referred to in the depositions. Maybe referred to, but it's not in there, so I can't look at it. All I can do is see what people said about it. Okay. Now, that I've looked at. So once again, I just need your notes. It was under reviewed at the motion for summary judgment that she said in her notes she was camping at ‑‑ they were camping at Pyramid Lake, history of suicide and drugs, camping with several adults, all appear intoxicated. That's what was in her notes. And we say, I believe, on page 12 of our deposition, there it is, I mean, page 12 of our motion for summary judgment, that refers to her deposition testimony, that that's what were in her handwritten notes. And that was all that was there. Okay. Now, I have on page 238 of the record that some of those facts are actually fleshed out, because she actually says, I related to Dina, Dina Negron, that we had a young mother out at Pyramid Lake, a two‑year‑old child that's intoxicated, acting belligerent and uncooperative with a PBT of .141. So that's sort of additional detail. I mean, there's a level of detail there she couldn't possibly have known from anybody else, at least up to .141. No, she knew that. And she knew that there was a positive drug test. Now, that's so ‑‑ Now, she wouldn't have known from dispatch. No. She knew from records that she had that the officer didn't have. Well, this was the information before her. But if I can, it's our position that the district court's analysis was in accordance with existing law, Saucier and Motley. The district court considered facts admittedly known to appellants. It considered facts available to appellants in the situation they confronted. And the district judge refused to give appellants extra credit for not doing their job or willful ignorance. There is the case of Motley and Mendocino Environmental Center that an officer has an ongoing duty to investigate when facts are insufficient. Mr. Friedman, I don't think I quite got an answer to my question. And if I did, please correct me. The evidence that what Brannon said to dispatch was passed on to Ms. Brandt consists of, in your view, her handwritten notes, which are an exhibit to a deposition, which we may ‑‑ which notes we may or may not have in the record. I've got that. Is there anything else that you can tell me would make the statements of Deputy Brannon circumstantial evidence that Brandt was lying when she said what she heard from dispatch? Only that there are ‑‑ they're not in accordance with her notes. There's no corroboration. And there's a stark difference, as the district court pointed out, in what Brannon says he said and what she says. But a point I want to make here, if I can, is that even if you take what she believed to be true, she still violated the Constitution. There was no immediate apprehension, reasonable apprehension of immediate physical injury, serious physical injury to this child in the time it would take to get a warrant, particularly because in the situation she faced, the police were cooperating with her. She never went out there. She never called the caseworkers. She never even asked, how's Amy? What's with the child? I mean, her investigation, she heard that the only thing that the judge found below that she heard was that the child was okay. She didn't ask where was the child, was the child ‑‑ she didn't make any inquiry. And I'm saying, we're saying in accordance with Motley and Mendocino Environmental Center that she had a duty to make a further inquiry here. There was a caseworker on the case she could have called. And according to Rachel, in the judge's decision, Rachel had informed her grandmother and her caseworker she was going to the lake. If they had only called the caseworker. They didn't know how old the suicidal ideations were. Who knows? They could have been years old. They didn't know how old the drug test was. But we did know that apparently the fact that suicide was mentioned by Rachel's mother. Yes. When she called and wanted the welfare check. And she said she's had suicidal ideations in the past. Right. But that's not something that's irrelevant when the mother of the ‑‑ when the grandmother of the baby, the mother of the mother of AG calls and says, I'm worried about my daughter and especially my granddaughter because my daughter has had thoughts of suicide. And apparently having the record that the grandmother mentioned that Rachel believed that she was going to lose custody of the child in the next week. Let me say that we don't believe that all those facts, it's not irrelevant. It's one fact. In a whole list of things she had. All those facts don't add up to imminent danger of serious physical injury in the time it would take to get a warrant because, first of all, we don't believe it's reasonable to believe that she's in danger of serious physical injury. In fact, Branch herself said in her deposition it could be speculation. She said that in her deposition, that her concerns were that the kid would be raped by somebody in her party, that the kid would go into the lake or into the desert. We asked, she didn't know how far from the lake she was or how far from the desert. Those concerns were all speculation, Your Honor. And as far as the appeal, if you look at Torres, first of all, before we believe that summary judgment should have been issued, that there is no immunity because if you take what they believed, if you just isolate what they believed, even though Saucier says the information reasonably available to them also, if you just take what they believed, their concerns were admittedly by them speculation. There was no articulable evidence that this child was going to be molested. There was no articulable evidence that she was going to wander into the lake and there was no articulable evidence that she would get lost in the desert. Those were speculations. Three things you said from the notes of Ms. Brant, which may or may not be in the record in her deposition. One, that she was camping near the lake. The location was proximate to danger. Two, that Ms. Brant and Ms. La Prairie had a history of suicide and her mother thought that that might come back. And three, that there was drug use. The drug report showed that she was using methamphetamines and amphetamines. Four, that there were several adults all intoxicated at the place. Well, there's a dispute as to that. On those four, you're telling me that none of those cause the condition of allowing a person to take possession of the two-year-old? Not without a warrant, especially with police on the scene, Your Honor. The situation in which this officer found herself was that she had the full cooperation of the police. She had to drive almost all the way there to pick up the child. And the police, DePaule was at that time, according to Brant's testimony, an officer with the tribe who drove her there. They drive a few miles. She has to drive all the way to Reno to Pyramid Highway. She could have gone to the scene and seen it just as easily as picking the child up without seeing it. So here's what she knew. Here's what we confess she knew. The mother was at Pyramid Lake with the child. She was either, there's various reports, mom was intoxicated. There was others with mother who were either drinking or intoxicated. If you look at Brant's depot, that changes. The mom was belligerent and uncooperative. She had an open file with social services, a positive drug test seven days before, a home visit planned for the next day. It was a home visit. But mom did believe that they were going to take her child away. So what did she do? She wanted to show her a good time the last night. She told her mother where she was going. She told the social worker where she was going. Her grandmother may have stressed out and put things together from a year before. Who knows? But both the social worker and the mother knew that she was going to the lake. The grandmother had requested a welfare check. At some unknown time, she had suicidal ideations. The Washoe County Sheriff's Rescue and the tribal police were on the scene. So if these factors add up to, first of all, Rogers says that, you know, if it happened days ago and you didn't take the child then, then it's not imminent danger. But also if these things add up to imminent danger, you have plenty of time to get a warrant. The police were there until she drove all the way out. The police, she could have just said, stay there. I'll be right there. Don't let anything happen. So we feel that, number one, under Rogers and the case law, that's not imminent danger of serious physical injury. And if it was, it couldn't have been visited on her in the time to get a warrant because there were cooperative police there. Now, maybe in some situations police may leave and you don't know. But these police were following the directions of social services once they got it off a dispatch. And her articulated concerns, as she said, were speculation, proximity to the lake and highway. You know, as we point out in another brief on the opposition to motion for summary judgment, this would be the same at the child's home. The mom had these past things. They let her go back to the home. The only difference was they were outside camping. Well, a child can open a door at a home or if they can open a zip tent, they can open a door. And the question is whether they acted reasonably under settled law. And that's Connor, the new, the more recent. So, Mr. Friedman, just so I can get things square in my head, the suit here is brought by the father. The mother is not a party to the lawsuit. Neither is the father, though. Under Nevada law, the father has to bring a lawsuit on behalf of a child. Okay. So this is brought on behalf of AG, the minor, because of her separation from her mother. Yes. Okay. It's not from her separation from her father. No, or there is. Because he had a restraining order on him. Yes. Okay. There is an issue as to whether or not she should have been immediately given to the grandmother, but that wasn't dealt with below. Yeah. I thought the record was pretty clear that the social worker didn't have a contact information for the maternal grandmother. She did have for the paternal grandfather, but there was some thought that the father may have lived with his mother and therefore they couldn't be returned there because he had a restraining order. Well, that hasn't been dealt with below. But let me say that the maternal grandmother, who calls in the report, is going to let the father, who allegedly molested this child and has a TPO, live with her? No, no, no, no, no, no. That's what they said. I believe what they said was that they did not have a contact information for the maternal grandmother, who's the one who called in and asked for the welfare check. Why wouldn't they have a contact if she called in? Dispatch would have it. Well, dispatch may, but social workers did not. Well, they didn't bother to get it. That's true, Your Honor. I'm not sure that violates the Constitution for them to fail to call dispatch to see whether they've got a number for the grandmother, but they did not have a contact information in the file. Okay. Well, that's true. And they didn't have a lot of things they could have had. They could have called the social worker. They could have gone to the scene. You know, if the information is insufficient, they have a duty to do a further investigation. Again, that's Motley and Mendocino. They just can't. See, we disagree that this Court has to stick to what they say they knew. It says what information was available to them is part of it. So they're not aware that they have to go to the scene.  And it says, according to Saucier, excuse me, and Motley, that, you know, if there's insufficient information, they have to inquire further. Isn't it relevant? Where is the child? How is the child? Should I go out to the scene, or should I just go three miles away and pick up the child, or five miles away, or whatever it is? They could have called the social worker and said, yeah, I know all that, if they would have called her caseworker. They would have told her, yeah, all this is stale information, and the purpose of the visit the next day, as it turned out, even though La Prairie thought it was maybe to take her child, it was just a home visit. They had already enlisted her for services, and they made another appointment to come back for a home visit. And, you know, if you're going to commit suicide, you don't go with other people to a beach where not only your friends are there, but other tents are there. And, you know, the fact of the matter is they were asleep. Amy was in the back of the tent. I'm sorry, A.G. was in the back of the tent. Nothing could have happened to her. She didn't inquire about any of these available facts, and she didn't have sufficient information based on what she had to take a child because she didn't know anything about the child. I think we understand your position. You're now well over your time. Thank you. I'm going to allow you one minute, Mr. Brown. Mr. Brown, would you please address the issue brought up by Mr. Friedman that the police were present? I think two types of police were present, and there was therefore no immediate danger, not even a danger of physical injury to the child as long as the police were there. Why couldn't a warrant be sought? Well, I think initially with regard to that, I believe the circumstances do justify the removal, the mere presence of a police officer to hold the child. But the bigger issue, and I would like to apply these facts to the qualified immunity analysis, is practically, and the record is supportive, there was no way for these social workers to get a warrant. There may have been the police, and there may have been a warrant. There was no mechanism. If you read the deposition testimony, I can get you a citation to the record. Wow, but that's not Rachel's fault. It's not the baby's fault. I agree. I agree completely, Your Honor. I'm not saying that it's not. I'm just saying that – That sounds like it may be Washoe County's fault. And they're a defendant in the court below on that issue. But when you're analyzing the people that we put in the ground in the community that are faced with these situations, that have no ability outside of their own employer – Washoe County remains a defendant in this case? Yes. Even if we were to agree with you, it would still be Washoe County would still be a defendant? Yes. They're not part of this appeal because they weren't entitled to a qualified immunity defense, and they had nothing to appeal from the denial of the summer general. You mean you don't have a duty judge in Washoe County that's available 24 hours a night? Not for family court matters. And it's been the position that family court has original jurisdiction on these issues, and there was no mechanism available for these individual workers to comply if you assume that the exigent circumstances didn't exist. I assume that Washoe County has corrected that? It's my understanding that there's now a procedure in place to obtain warrants after hours. So the evidence is – and Mr. Friedman can indicate his noncompliance if he wants to – the evidence is that Brandt knew that evening or that night that she couldn't raise a judge to get a warrant? Well, I don't know if it – based upon the training that she received and the instruction that she received, she felt that she was complying with the Nevada state statute in her S-432B. I'm not interested in what Ms. Brandt felt. That may go as to what her fingers touched. But I want to know what she knew and what she thought and what the evidence is. I'm not so sure she even thought about it because it wasn't done. She was not trained. If you look at the – It wasn't done. I know it wasn't done. But the question is, was the service available, and did Ms. Brandt know that it was available or that it wasn't available? It was not available. Did she know that? It wouldn't make any difference. She wouldn't get the warrant anyway. Okay. It wasn't available, and I don't mean to be circular, but I don't know that she would have thought about it because that's not a process that they ever went through. With regard to the prior question, we do not have the, as I indicated earlier, the test results in the record, but the testimony regarding the test results is at 234 and 235. The final point I would like to make is a couple points. One is which that when Ms. Brandt was faced with this litany of questions about what she could be concerned about, counsel seemed to make fun of the fact that she was concerned about a child being molested. There was an ongoing investigation that this child had been, in fact, molested. So it's not necessarily a far-reaching grasp for Ms. Brandt to be concerned about a child that's possibly a prior victim of sexual abuse and that is in the care and custody of a control of an intoxicated mother with other people that are intoxicated. It's not the stretch that counsel makes you seem to think it is. With all that said, I think it's important to analyze the qualified immunity and the facts known to the individual workers at the time, and there is a disparity. Clearly, if the court finds that somehow through the supposition that there is some type of disputed fact of what dispatch gave to Brandt, there is nothing in the record anywhere that says that Brandt ever gave that information to Negron. Negron only relied upon Brandt, only talked to Brandt. And so that is something that needs to be dealt with differently. If there is an issue of fact with regard to Ms. Brandt's conduct, that's certainly not an issue of fact with regard to Ms. Negron's conduct. Thank you. Thank counsel for the argument. That concludes the calendar for this afternoon. The court is adjourned. Thank you.
judges: Restani, Bybee, Bea